Stephen R. Buckingham
Matthew Savare
**LOWENSTEIN SANDLER P.C.**
65 Livingston Avenue
Roseland, NJ 07068
(973) 597-2500
Attorneys for Defendant Rykodisc, Inc.

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADELAIDE GAIL ZAPPA, individually and as sole trustee of THE ZAPPA FAMILY TRUST U/T/D NOVEMBER 15, 1990, a California Revocable Trust,<br><br>      Plaintiff,<br><br>v.<br><br>RYKODISC, INC.,<br><br>      Defendant. | 08-CV-00396 (WHP)<br><br>**DECLARATION OF<br>MATTHEW SAVARE, ESQ.** |

  **MATTHEW SAVARE**, being of full age, does hereby certify as follows:

  1. I am an attorney with Lowenstein Sandler, P.C., attorneys for the Defendant, Rykodisc, Inc. in the above-captioned matter. I am admitted to practice in this Court.

  2. I am familiar with the facts and circumstances as set forth herein and make this Declaration in support of the instant motion to dismiss with prejudice Plaintiff's Lanham Act claim (Seventh Claim) pursuant to Fed. R. Civ. P. 8(a) and 12(b)(6), and, in the alternative, for a more definite statement for the Lanham Act claim pursuant to Fed. R. Civ. P. 12(e), and for a more definite statement for the breach of contract claim (Second Claim) pursuant to Fed. R. Civ. P. 12(e).

17152/12
06/17/2008 7752597.1

-2-

3. Annexed as Exhibit A is a true and accurate copy of the Settlement Agreement, dated as of March 5, 1999, by and between Plaintiff, individually and as a trustee of the Zappa Family Trust, and Defendant. For the convenience of the Court, I have not attached the lengthy schedules, as they are not relevant to the instant motion. Should the Court request these schedules, I will promptly submit them to the Court.

I certify that all of the foregoing statements made by me are true, and I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

By: *Matthew Savare*
Matthew Savare

Dated June 17, 2008

-3-

**EXHIBIT A**

**EXHIBIT A**

SETTLEMENT AGREEMENT made as of March 5, 1999, by and between Adelaide Gail Zappa, individually and as trustee of the Zappa Family Trust ("The Trust"), on the one hand (jointly and individually "Zappa Part(y)(ies)"), and Rykodisc, Inc., on the other hand ("Ryko").

Reference is made to the following:

The agreement ("Purchase Agreement") dated as of October 6, 1994 between the parties (et alia) pursuant to which Ryko purchased certain master recordings ("Ryko/Zappa Recordings" or "Subject Masters"") of Frank Zappa ("Artist"). The terms used herein if not specifically defined herein shall have the same meanings as such terms have under the Purchase Agreement.

The escrow agreement ("Escrow Agreement") executed by the parties in connection with the Purchase Agreement pursuant to which the Chase Manhattan Bank of Connecticut, N.A. ("Escrow Holder") held various sums which were withheld from the purchase price otherwise payable to the Zappa Parties under the Purchase Agreement and placed in escrow against obligations and liabilities of the Zappa Parties.

The suit (the "Action") commenced by Zappa Parties against Ryko in the U. S. District Court, Southern District of New York (the "Court") (97 Civ. 9459), and the claims and counterclaims of the parties against each other in the Action ("Claims")-

WHEREAS, various disputes have arisen between the parties relating to the subject matter of the Purchase Agreement and distribution of the funds being held by the Court ("Escrow Funds"), and

WHEREAS the parties wish to settle their disputes, including the issues arising out of the Action and the Claims therein,

NOW, THEREFORE, in consideration of the foregoing and other good and

Friday March 5, 1999 4:59 pm
F:\WWPDOCS\11116\200405\19335V.15

valuable consideration, the parties have agreed to resolve their disputes and dismiss their Claims in the Action with prejudice, and the parties hereby agree as follows:

1. Payment of the Escrow Funds will be made to each of the parties as follows: $250,000 to Ryko and the balance of the Escrow Fund less costs and expenses deductible therefrom by the Court, to the Zappa Parties (payment to the Zappa Parties shall be to and in the name of The Trust). The parties hereby agree to direct the Court to issue such payments to each of them as aforesaid and agree to execute such additional documents as reasonably necessary to accomplish the foregoing.

2. a. Ryko, on its behalf and on behalf of its successors and assigns, and its and their present and former shareholders, officers and directors, hereby releases the Zappa Parties, their successors, employees, principals, officers and stockholders, from all actions, causes of action, suits, claims and demands ("causes of action") interposed in the Action and any other claims or matters based upon facts of which Ryko has knowledge, which causes of action Ryko ever had or now has from the beginning of the world to the date of this release. Nothing contained herein shall be deemed a limitation of Ryko's right to audit the Zappa parties to the extent allowed under the Purchase Agreement.

b. To the extent necessary to effectuate the assignment to Ryko of the Agreement between The Trust and Music For Nations, ("MFN Agreement"), The Trust agrees to reasonably cooperate with Ryko in respect to its pending audit claims against Music For Nations, including, but not limited to, if requested by Ryko, to institute and prosecute litigation through counsel selected by Ryko, furnishing such information as Ryko may reasonably require, cooperating in connection with pre-trial discovery, providing witnesses for deposition and/or trial as reasonably requested by Ryko; provided that The Trust shall not be obligated to incur any costs or expenses in respect thereto. Ryko agrees to indemnify and hold harmless The Trust and The Zappa Parties and each of them from and against any and all claims, demands, actions, causes of action, damages, costs and expenses, (including without limitation reasonable attorneys fees and court costs), liabilities and sums of money arising out of, relating to or concerning

any and all claims of Ryko against Music For Nations in respect to the validity or enforceability of the Assignment and Extension Agreement between MFN and The Trust dated September ___, 1994 (herein "MFN Assignment Agreement"). With respect to the foregoing, The Trust agrees to accept representation by counsel selected by Ryko (if Ryko so elects), in which case Ryko shall not be obligated to pay the attorneys fees of any other counsel. Ryko shall be responsible for any attorneys fees, costs or sanctions awarded against The Trust as a result of any such action, unless and to the extent that, such award is due to misconduct by The Trust. The Trust irrevocably agrees that it shall waive any conflict of interest with respect to any counsel selected or furnished by Ryko under this paragraph 2.b., provided, however, that such counsel may not disclose or use against The Trust any privileged information furnished by The Trust.

      c.     The Trust hereby represents and warrants that there are no other agreements between the Zappa Parties and MFN other than the MFN Agreement and other than the MFN Assignment Amendment.

     3.     The parties, simultaneously with entering into this Agreement, and as a material condition hereto, will enter into the trademark license agreement ("Trademark Agreement") annexed hereto as Exhibit A.

     4.    a.     The Zappa Parties, on their behalf and on behalf of their successors and assigns, hereby release Ryko, its successors, parent, principals, employees, officers and stockholders, from all actions, causes of action, suits, claims and demands ("causes of action") interposed in the Action and any other claims or matters based upon facts of which the Zappa Parties have knowledge, which causes of action the Zappa Parties ever had or now has from the beginning of the world to the date of this release, with the exception of any claim based upon the release of a laser disc compilation in Japan entitled "Psychomania" embodying a Frank Zappa video of "Son of Suzy Creamcheese" from "Absolutely Free" LP and possible claims based upon release of "Bobby Brown" on audiovisual devices or for broadcast, it being understood that reference to such possible claims does not constitute acknowledgment by Ryko that it is involved in the use of

such material or in any way responsible to the Zappa Parties therefor. Nothing contained herein shall be deemed a limitation of the Zappa Parties rights to audit in respect to mechanical royalties payable by Ryko.

      b.    In particular, without limiting Ryko's other rights, it is acknowledged that all claims based upon facts of which the Zappa Parties have knowledge based on all manner of exploitation as of the date hereof by Ryko of sound recordings featuring the performances of Frank Zappa, including names and likenesses used and methods of compilation undertaken, methods of advertising, art work, promotion, marketing and other exploitations are covered by the provisions of paragraph 4(a) above and may continue hereafter in respect to the sound recordings as to which the same were used or undertaken prior to the date hereof, except as specifically limited or made subject to this Agreement, including without limitation the following:

      i.    The manufacture, distribution, advertising and sale of the Soundtrack LP "200 Motels" shall be governed by a separate agreement between The Trust and MGM/UA (which the Trust warrants is attached hereto as Exhibit B). Ryko hereby agrees to be bound to the provisions of paragraphs 2, 4, 6, 7 and 8 as they pertain to Ryko, except with regard to the mechanical royalty rate set forth in paragraph 8 if the LP becomes a Subject Master under the Purchase Agreement at which point the mechanical rate shall be governed by the Purchase Agreement;

      ii.    All existing art work used worldwide will be corrected by Ryko when ready to be reprinted, to include Frank Zappa as the producer of all Subject Masters (except "Freak Out" as to which the credit shall read "Produced by Tom Wilson with Frank Zappa") and the Art Director of all Album Cover Art work, as reasonably directed by The Trust in accordance with the standards of the existing art work as created or approved by Frank Zappa, and to delete the "FZ" trademark from any albums and compilations not produced by Frank Zappa, including without limitation, "Strictly Genteel";

      iii.    The printed Ryko catalog booklets of Ryko/Zappa Recordings will be corrected when ready to be reprinted to eliminate the attribution to Cal Shenkel of the quote "He Made Us Do It" and the reference to "Nifty, Tough and Bitchin'; Ryko also agrees to delete "and a variety of Cool FZ related Stuff";

      iv.    The Album "Strictly Genteel" shall not be released or exploited in Mainland China;

      v.    Any compilation or master not compiled and created by Frank Zappa (i.e. those not delivered by The Trust as complete albums of Subject Masters under the Purchase Agreement) shall be clearly so designated with a legend as follows: "Each track was produced by Frank Zappa but the compilation was not prepared by Frank Zappa", or otherwise as mutually approved, and the art work of such compilations and masters now in release shall be corrected by Ryko, upon reprinting, to include such legend;

      vi.    Ryko agrees not to use any photographs of Frank Zappa (other than those previously delivered to Ryko by the Zappa Parties or otherwise previously approved by them for the same purpose for which Ryko intends to use such photographs, or as otherwise subject to the Purchase Agreement) unless it shall first reasonably cooperate with the Zappa Parties to acquire for the Zappa Parties all rights from photographers in and to the worldwide copyright or other rights of use as requested by The Trust in all photos of Frank Zappa hereafter intended to be used by Ryko for cover art work, advertising or promotion, as well as from all persons or entities that have contributed to any alterations or modifications to the Cover Art, subject to Ryko's retaining the rights to use the same in accordance with the Purchase Agreement. Ryko shall secure from all persons or entities employed by it or commissioned by it to make such alterations or modifications, an assignment to The Trust of all rights in and in such modifications and alterations. The Parties will share the cost as mutually agreed of acquiring such copyrights and other rights in proportion to their respective rights to

utilize the same. The Zappa Parties shall at their expense have the exclusive right to the file and obtain Copyright Registrations for all works which contain such alterations and modifications in the name of The Trust as derivative works of the prior Cover Art. The Trust agrees subject to the Purchase Agreement to reasonably assist Ryko without any cost to the Zappa Parties, except as set forth above, in obtaining rights to a reasonable number of such photographs which Ryko may locate from time to time in connection with the sale, exploitation, advertising and promotion of Ryko/Zappa Recordings;

   vii. "Lumpy Gravy" shall be corrected by removing the PQ names from the art work and will be replaced with "Part I and Part II";

 c. The Zappa Parties agree that no further sums are owed by Ryko to the Zappa Parties or their affiliates in connection with such materials delivered by them or services rendered by them to Ryko, except as otherwise provided herein.

 d. Ryko shall within 30 days after execution hereof return to The Trust all original art work materials previously delivered to Ryko, together with a copy of all materials created by Ryko which were copyrighted to The Trust.

5. At Ryko's request, the Zappa Parties agree hereafter to produce for exploitation by Ryko, 20 bit masters from the master recordings listed on Schedule B annexed hereto for release in connection with Ryko's AU20 series, consistent with the same work previously completed with respect to the albums called "Apostrophe"('), "One Size Fits All", "Tinseltown Rebellion" and "You Are What You Is". Ryko shall reimburse the Zappa Parties for all its costs and expenses of such preparation, pursuant to a reasonable budget for each album mutually approved in advance by the Parties. Said amount shall be paid by Ryko half on commencement of the work and half upon delivery to it of such materials. On execution hereof, Ryko shall pay The Trust the sum of $5,000 for "Apostrophe" and "One Size Fits All." Should Ryko hereafter release "Tinseltown Rebellion" or "You Are What You Is" in the AU 20 format, it shall pay The Trust the sum of $2,500 for each such LP so released, upon its release in AU20 format.

Schedule B also contains the delivery schedule for such materials; however, if with respect to a particular album the underlying masters needed to perform such work are not in The Trust's possession nor available to the Zappa Parties, or are not viable or technically suitable for these purposes, then the Zappa Parties will so advise Ryko and (unless Ryko requests otherwise) proceed to the next album on Schedule B in replacement thereof (and the date of delivery of each subsequent album on such list shall be moved forward consecutively).

6. Schedules C and F contain a list of recordings which Ryko wishes to release and exploit. The Zappa Parties contend that they own some or all of these recordings and that the same are not Subject Masters under the Purchase Agreement, whereas Ryko contends to the contrary. Without prejudice to either party's position, and for purposes of settlement only, the Zappa Parties agree, upon mutual agreement as to a release schedule, and with at least six (6) months prior notice in writing, to prepare masters suitable for use of Ryko of the Schedule C and F recordings for release and exploitation by Ryko, and that such Masters shall hereafter be deemed Subject Masters under the Purchase Agreement The Schedule F Masters shall continue to remain subject to the provisions of Paragraph 12.5 of the Purchase Agreement.

If The Trust cannot identify the appropriate recordings from Schedule C itself, Ryko shall, upon request of The Trust, supply a tape copy to the Zappa Parties of each of the Schedule C recordings for identification purposes. To the extent the recording requested from Schedule C is identical to the final version of such recording as embodied on a Subject Master already delivered by the Zappa Parties to Ryko, Ryko shall use such Subject Master. By way of clarification, for a recording to be "identical" it must contain all the same fixations of sound and also be in the same technical format and quality: e.g., a different mix of the same recording would not be identical. Otherwise, The Trust will prepare the Master from its vault, if available, and technically suitable and viable. If the Zappa Parties are unable to locate a viable or technically suitable recording from which to prepare a master, The Trust will prepare a master from the best version it or Ryko can obtain as mutually agreed. Ryko shall pay or reimburse

The Trust for all costs and expenses of The Trust in connection with such work, pursuant to a reasonable budget mutually approved in advance by the parties.

All records embodying the Schedule C recordings shall bear a legend as follows: "Each track was produced by Frank Zappa but the compilation was not prepared by Frank Zappa" or as otherwise may be mutually agreed upon, clearly indicating that Frank Zappa did not compile the record and that the recording embodied on the record was not the final approved version of Frank Zappa.

7. Schedule D lists recordings which Ryko wishes to release and exploit which would require the transfer of the original mix to digital format. The Zappa Parties contend they own these recordings and that the same are not Subject Masters under the Purchase Agreement, whereas Ryko contends to the contrary. Without prejudice to either party's position, and for purposes of settlement only, the Zappa Parties agree, upon mutual agreement as to release date, and with at least six (6) months prior written notice, to transfer the original recordings to digital format and deliver same to Ryko, provided that the original recordings are available, technically suitable and viable for being so transferred. Ryko shall pay or reimburse The Trust for all costs and expenses of The Trust in creating the digital master of the original version pursuant to a reasonable budget, mutually approved in advance by the parties.

The Schedule D recordings may only be used by Ryko subject to the following restrictions:

a. The Schedule D recordings constituting one Album as originally released may be released and otherwise exploited by Ryko only as part of that same Album and not separately;

b. The art work as used on the original release of such Album embodying Schedule D recordings must be used for Ryko's re-release as approved by The Trust as to accuracy of the textual material and any changes in the art work or the

text, or either;

      c.      The Ryko release of Schedule D recordings must bear a legend that the Ryko release is not the final Frank Zappa approved 1630 digital master of the Album;

      d.      The Ryko release of an album embodying Schedule D recordings may continue to be manufactured, distributed and sold in any territory only so long as Ryko or its licensees also maintains in its catalog in the same territory, records embodying the final Frank Zappa approved 1630 digital masters of the same album notwithstanding the fact that the individual titles in these final Frank Zappa approved albums may be individually available on compilations.

      e.      Upon the occurrence of both of the events specified in subsections (A) and (B) of paragraph 2.2(e) of the Purchase Agreement, Ryko's rights to exploit such Schedule D Recordings shall cease subject to its right to sell off its remaining inventory of such records. The Zappa Parties shall have no right to use or exploit such Schedule D Recordings except as otherwise provided in the Purchase Agreement.

      8.      Upon execution hereof, Ryko will execute the document annexed hereto as Schedule G-1, to assist the Zappa Parties with their attempt to receive a refund of tax withheld in the United Kingdom on mechanical copyright royalties. In addition, Ryko will deliver an original signed copy of the letters attached hereto as Schedules G-2 and G-3 upon execution of this agreement.

      9.    a.      A promotional video reel was previously compiled by Ryko, as more fully described on Schedule H annexed hereto. It is agreed that clips from such video or portions thereof may be utilized by Ryko for broadcast on television only for the purpose of promoting the sale by Ryko of Ryko/Zappa Recordings, subject to Ryko's placement by burning it on the videotape itself and by affixing a sticker on the packaging of all copies distributed to third parties for television broadcast a copyright

notice as follows: "Copyright 1998 by Appointment to Her Majesty the Scarlet Pimpernel" and the following legend, indicating the limited use of such materials:

> "Materials herein cannot be broadcast other than in connection with the promotion of recordings of Frank Zappa released by Rykodisc. In addition, these materials may not be copied, edited or altered except solely to shorten or extract excerpts therefrom for such broadcast purposes, unless written consent is obtained from Rykodisc and the Zappa Family Trust." No use shall convey or imply a copyright interest to the materials herein. Any other use requires the express written consent of the Zappa Family Trust, P.O. Box 5265, North Hollywood, CA 91616; telephone (818) 755-3700. Unauthorized duplication is a violation of applicable laws. All rights reserved."

Ryko shall advise The Trust in writing as to each recipient of a copy of the promotional video reel and shall send a cover letter with each copy of the reel calling the recipient's attention to the above-mentioned restrictions.

       b.    In respect to the use of videos for in store or other retail promotional purposes, Ryko shall not use more than four videos on each reel supplied for such purposes. Such videos may be utilized by Ryko for exhibit in retail outlets for the purpose of promoting the sale by Ryko of Ryko/Zappa Recordings, subject to Ryko's placement by burning it on the videotape itself and by affixing a sticker on the packaging of all copies distributed to third parties for exhibition, a copyright notice as follows: Copyright 1998 by Appointment to Her Majesty the Scarlet Pimpernel" and the following legend, indicating the limited use of such materials:

> "Materials herein cannot be exhibited other than in connection with the promotion of recordings of Frank Zappa released by Rykodisc. In addition, these materials may not be copied, edited or altered unless written

consent is obtained from Rykodisc and the Zappa Family Trust." No use shall convey or imply a Copyright interest to the materials herein. Any other use requires the express written consent of the Zappa Family Trust, P.O. Box 5265, North Hollywood, CA 91616; telephone (818) 755-3700. Unauthorized duplication is a violation of applicable laws. All rights reserved."

Ryko shall advise The Trust in writing as to each recipient of a copy of all videos, and shall send a cover letter with each copy of the reel calling the recipient's attention to the above-mentioned restrictions.

10. The Action will be dismissed with prejudice, and all Claims withdrawn, and each party will execute all documents reasonably necessary for the purposes of the foregoing, including without limitation the stipulations annexed hereto and instructions to the Court for the issuance of payments as set forth in paragraph 1 above. In addition, the Parties will execute simultaneously with the execution of this Agreement, a stipulation in the form of Exhibit C annexed hereto in connection with the Action.

11. Subject to the provisions of Paragraph 12 below, this agreement contains the entire agreement of the parties with respect to the subject matter hereof, supersedes any and all prior agreements relating thereto, and may not be modified or amended except by a writing signed by the party to be charged.

12. Except as expressly modified herein, the provisions of the Purchase Agreement remain in full force and effect; and the terms of the Purchase Agreement (including without limitation notices, choice of law and venue, waivers, construction etc.) shall apply to this settlement agreement as well.

13. Execution by the Zappa Parties of this agreement and the releases contained herein shall be deemed on behalf of the successors of Pumpko Industries, Ltd., (dissolved), Moon Unit Zappa, Dweezil Zappa, Ahmet Zappa and Diva Zappa (who for

Wednesday March 3, 1999 4:58 pm    -11-
F:\WWPDOCS\11116\200405\19335V.15

such purposes shall be deemed "Zappa Parties"); and The Trust shall indemnify and hold Ryko harmless from any damages, claims or expenses (including reasonable attorney fees) arising from any claims, suits or actions by such other Zappa Parties (or on their behalf) relating to The Trust's authority to enter into this Agreement on their behalf.

14. The Zappa Parties and Ryko warrant, represent and agree with each other that they are empowered to enter into this agreement, that they have not transferred to any other parties their rights with respect to the subject matter hereof, and that no other party has the right to bring the Claims heretofore brought by each of the Parties in the Action.

15. The Agreement shall be binding upon and inure to the benefit of the parties hereto and of their respective parent, subsidiary and related persons, firms and corporations, and their respective successors, assigns, licensees, sublicensees, distributors, agents, employees, shareholders, partners, agents and officers.

16. Except as otherwise expressly provided herein, nothing contained herein shall require Ryko to remove or destroy its product in inventory existing as of the date hereof, and Ryko may sell off the same. Ryko shall not be required to cause any changes to be made by licensees if it cannot legally compel them to do so, but will do so at such time, if ever, as it can require them to do so.

17. For settlement purposes only, Ryko acknowledges that the Masters listed on Schedule E hereto are Excluded Masters under the Purchase Agreement.

18. Notwithstanding anything to the contrary contained in the foregoing Agreement, and except as expressly provided in this paragraph 18, the parties do not intend the releases contained herein or other provisions hereof to release, affect, compromise or otherwise prejudice their positions in respect to the following:
    (a) The LP "Lather" released by Ryko as to which the Zappa Parties claim ownership and reversion rights at the end of the Hold Back Period as

defined in the Purchase Agreement, in certain master recordings embodied thereon, and Ryko contests such ownership and reversion rights;

(b) LP's such as "Strictly Genteel" created or released (other than "Strictly Genteel") after the date hereof which the Zappa Parties claim is violative of their rights both in content and title and Ryko contends to the contrary;

(c) Ryko's right to translate lyrics and art work liner notes without the specific permission of the Zappa Parties, which the Zappa Parties contend is unlawful and Ryko contends to the contrary;

(d) Ryko's right to use any intellectual property of Frank Zappa embodied in his writings, interviews or other statements, oral or written without the prior approval of The Trust, except as granted in the Purchase Agreement; and

(e) The right to compile parts of classical works with parts of other classical works after the date hereof such as was done on the LP "Strictly Genteel," which the Zappa Parties contend is violative of their rights and Ryko contends to the contrary.

(f) Ryko's rights under the Purchase Agreement to delivery of Subject Masters as defined therein.

Accordingly, while the parties intend that the releases in paragraphs 2 and 4 above shall include claims based on the foregoing arising out of acts or omissions occurring prior to the date hereof interposed in the Action and any other claims or matters based upon facts known to the releasing party, it is not their intention to waive, release or prejudice any claims arising after the date hereof, whether of the same or a similar nature, or any defenses thereto.

19. This Agreement may be executed in Counterparts, and each such Counterpart shall be deemed an original hereof. Accordingly, this Agreement shall become binding upon executing of separate originals by the Parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the date first above written.

RYKODISC INC.


By_____


_____
Adelaide Gail Zappa, individually and as
sole trustee of the Zappa Family Trust, and
on behalf of all Zappa Parties.