UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
ADELAIDE GAIL ZAPPA &  :
ADELAIDE GAIL ZAPPA as sole trustee of  :
The Zappa Family Trust u/t/d November 15, 1990  :
a California Revocable Trust,  :
  :
               Plaintiffs,  :
  :
   -against-  :
  :
RYKODISC, INC.,  :
  :
               Defendant.  :
------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/17/11

08 Civ. 396 (WHP)

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

      Plaintiff Adelaide Gail Zappa ("Gail Zappa"), widow of rock legend Frank Zappa ("Zappa"), individually and as sole trustee of the Zappa Family Trust (collectively, "ZFT"), brings this action against Defendant Rykodisc, Inc. ("Ryko") alleging, inter alia, violations of the Copyright Act, 17 U.S.C. § 101 et seq. and breach of contract. Ryko asserts several counterclaims, also for copyright infringement and breach of contract. All parties move for partial summary judgment. For the following reasons, Ryko's motion is granted in part and denied in part. ZFT's motion is denied.

BACKGROUND

I. The 1994 Agreement and 1999 Settlement

      Frank Zappa released more than sixty albums before his death in 1993, when all rights, title and interests in his sound recordings passed to ZFT. In 1994, ZFT entered into an agreement with Ryko (the "1994 Agreement"), pursuant to which Ryko paid $20 million for

"certain rights in and to the actual versions and mixes of the sound recordings commercially released or exploited with the authority of Zappa prior to October 6, 1994" (the "Subject Masters"). (ZFT Counterstatement of Material Facts Pursuant to Local Rule 56.1 ("ZFT 56.1 Counterstmt.") ¶ 1; Declaration of Matthew Savare dated Mar. 19, 2010 ("Savare Decl.") Ex. A: 1994 Agreement.) Paragraph 1.1 of the 1994 Agreement provides in relevant part:

> [ZFT] hereby sell[s], transfer[s] and assign[s] to Ryko . . . all right, title and interest . . . to all sound recordings of the performances of [Zappa], alone and/or with other performers, which have heretofore been commercially released or exploited by or with the Authority of [Zappa] or parties deriving rights from [Zappa].

(1994 Agreement ¶ 1.1.) These rights were conveyed for "whatever kind and nature in any and all media now existing or hereafter discovered, developed, or devised in any jurisdiction throughout the universe in perpetuity." (1994 Agreement § 1.1.) However, paragraph 12.11 provides that "[n]o remixes, edits, changes in technical standards or other changes will be made by Ryko to the Subject Masters which would impact the integrity of the work as embodied in 1610 or 1630[1] final version of each of the Subject Masters delivered." (1994 Agreement ¶ 12.11.)[2] ZFT retained the rights to "Vault Masters, which are defined as master recordings other than the Subject Masters. (1994 Agreement ¶ 2.1.) Paragraph 8.4, titled "Tangible Materials," provides that ZFT shall "deliver to Ryko . . . the best copies available of all tangible assets, physical materials and/or embodiment of the Subject Masters . . . [in] 1610s or 1630s of the final version of each Subject Master or the equivalent thereof." (1994 Agreement ¶ 8.4.)

---

[1] 1610 and 1630 "refer to a format of music delivery equal to CD-quality audio." (Declaration of Joe Travers dated Apr. 9, 2011 ¶ 9.)

[2] ZFT has submitted evidence that the comparatively low sound quality of MP3s impacts the integrity of Zappa's work. (See, e.g., Travers Decl. ¶ 11; Zappa Decl. ¶¶ 74-75.)

In 1997, ZFT asserted claims against Ryko for alleged breaches of the 1994 Agreement. These claims were resolved in 1999 ("1999 Settlement"). (ZFT Counterstmt. ¶ 2; Savare Decl. Ex. D: 1999 Settlement.) The 1999 Settlement stated in part that:

> The Zappa Parties . . . hereby release Ryko . . . from all actions, causes of action, suits, claims, and demands . . . based upon facts of which the Zappa Parties have knowledge . . . [including claims] based on all manner of exploitation as of the date hereof by Ryko of sound recordings featuring the performances of Frank Zappa . . . .

(1999 Settlement ¶ 4(a).)

II. Strictly Commercial

In 1995, Ryko released an album titled Strictly Commercial: The Best of Frank Zappa ("Strictly Commercial"), which contained the Vault Master tracks "Yellow Snow," "Joe's Garage," and "Montana." (Savare Decl. Ex. C: Expert Report of Matthew Hurewitz ("Hurewitz Rep.").) A Japanese import version of Strictly Commercial, released in 2002, also contained the Vault Master track "Dancin' Fool." ZFT has identified three additional albums that also contained these Vault Master tracks: The Best of Frank Zappa, released in 2004; a Rykodisc 20th Anniversary album, released in 2004; and an alternate version of Strictly Commercial, release date unknown. (Hurewitz Rep.) Prior to 1999, Gail Zappa was aware that Ryko had "released one version of a compilation CD called 'Strictly Commercial: The Best of Frank Zappa' in physical CD form." (Declaration of Adelaide Gail Zappa dated Apr. 9, 2010 ("Gail Zappa Decl.") ¶ 48.) However, she contends that she was aware of its use as a "physical promotional CD" but only "later" discovered that it was being sold. (Gail Zappa Decl. ¶ 48.) Although she does not provide a timeframe for her discovery, a 1996 fax from Ryko to Gail Zappa noted that

"[e]very Christmas season [Ryko] will be focusing on Strictly Commercial . . . as a 'great gift idea.'" (Savare Decl. Ex. K: Fax from Jill Christiansen to Gail Zappa, Jan. 4, 1996.) In addition, royalty statements from 1997 show payments made for sales of Strictly Commercial. (Savare Decl. Ex. M: Royalty Statements.)

III. The Restricted Cuts

Three Subject Masters—"Watermelon in Easter Hay," "Black Napkins," and "Zoot Allures"—were defined as "Restricted Cuts" under the 1994 Agreement and were subject to limitations on their use. (ZFT Counterstmt. ¶ 12; 1994 Agreement ¶ 12.4.) Under paragraph 12.4, Rykodisc agreed that the Restricted Cuts "will not be coupled with other master recordings or licensed for individual synchronization use or otherwise used individually . . . and such masters may only be used on those Albums of Subject Masters they have heretofore been on." (1994 Agreement ¶ 12.4.)

In 2004, Ryko contracted with Apple to distribute in digital format certain Zappa albums and songs on iTunes. (Declaration of Miles J. Feldman dated Apr. 9, 2010 ("Feldman Decl.") Ex: 12: Agreement Between Apple and Ryko dated Jan. 23, 2004 ("Apple Agreement"). The Apple Agreement stated that "[e]xcept for a special circumstance, such as . . . a contractual restriction, [Ryko] shall otherwise make all e-masters available to Apple hereunder for sale on the Online Store in both a so-called 'single' format and in a 'multi-track album' format." (Apple Agreement ¶ 2(c).) On August 9, 2005, the Zappa catalog became available on iTunes. (Savare Decl. Ex. P: Email from A. Cimini to T. Enright et al., Aug. 11, 2005, 18:00.) Prior to that time, Ryko advised Apple frequently that the Restricted Cuts were subject to certain limitations. (See,

e.g., Savare Decl. Ex. R: Email from Abby Cange to Thomas Enright et al., May 24, 2005, 13:29 ("Please note that some albums have track restrictions."); Savare Decl. Ex. S: Email from Abby Cange to bybarra@apple.com, July 18, 2005, 17:11 ("[A]ttached is a file which specifies all [Z]appa track/album restrictions. I want to make sure you guys know about these restrictions, since some albums have to be full album download only, and some tracks can only be sold as part of a full album download.").) ZFT has identified zero downloads of "Watermelon in Easter Hay," one download of "Black Napkins," and fifty downloads of "Zoot Allures" in singles format.

The Apple Agreement further provided that "[Ryko] hereby grants a non-exclusive right to Apple [to] . . . perform and make thirty (30) second clips of [Ryko] Content available by streaming ("Clips") to promote the sale of applicable eMasters on the online store." (Apple Agreement ¶ 2(a)(ii).)

### III. MOFO, Lumpy Money, and Hot Rats Vinyl

Under the 1994 Agreement, Ryko acquired the rights to the Zappa albums Freak Out, We're Only In It For the Money ("WOIIFTM"), and Hot Rats, as Subject Masters. Ryko asserts counterclaims based on three related ZFT releases: The MOFO Project/Object ("MOFO"), Lumpy Money, and a vinyl release of Hot Rats ("Hot Rats Vinyl"). Zappa released "Freak Out!" in 1966. (1994 Agreement ¶ 1.1; Savare Decl. Ex. A-1: Schedule A to the 1994 Agreement ("Schedule A"), at ZAP632, ZAP656.) Forty years later, ZFT released "MOFO," an acronym for "the making of Freak Out," as 2- and 4-CD packages. (Savare Decl. Ex. DD: MOFO Liner Notes.) The MOFO liner notes state that Disc 1 is the "Original Vinyl Stereo Mix"

of Freak Out. (Ex. DD.) Gail Zappa concedes that Disc 1 is "the entire Freak Out album in its original sequence." (Savare Decl. Ex. EE: Deposition of Gail Zappa dated Sept. 21, 2009 ("Gail Zappa Dep.") 216.) It is composed of "the same performances that are on the Ryko version of Freak Out . . . [and] not alternate takes that were at a different time." (Gail Zappa Decl. 216.) Joe Travers ("Travers"), ZFT's "Vaultmeister," stated that Disc 1 of MOFO was created from "the same tape that was used to create the original vinyl release of Freak Out back in the 1960s." (Savare Decl. Ex. FF: Deposition of Joe Travers dated Sept. 21, 2009 ("Travers Dep.") 216.)

In 1968, Zappa released WOIIFTM. (Schedule A at ZAP709.) Forty years later, ZFT began selling Lumpy Money, a 3-CD set that included the "1968 Original Mono Mix" of WOIIFTM as part of Disc 1 and the "1984 UMRK Remix, originally released on CD [in] 1986" as part of Disc 2. (Savare Decl. Ex. GG: Lumpy Money Liner Notes.) The 1968 Original Mono Mix was composed of "the same performances that are on the Ryko version of [WOIIFTM]. It's just a different mix . . . derived from the same source recordings." (Travers Dep. 64.) The 1984 UMRK Remix was released by Ryko prior to 1994. (Travers Dep. 66.)

In 1969, Zappa released Hot Rats. (Schedule A at ZAP662.) In 2008, ZFT licensed the right to sell Hot Rats in vinyl format ("Hot Rats Vinyl") to a third party record company, Classic Records. (Gail Zappa Dep. 104.) Hot Rats Vinyl was based on "the original 1969 master tape used for the first pressings [of Hot Rats] in 1969." (Travers Dep. 16.)

IV. Ringtones

In or around 2008, ZFT began selling cell phone ringtones based on ten-second clips of Zappa songs in MP3 format. (Gail Zappa Dep. 11-12; Ex. II: Ringtone Sales Records

Summary.) At his deposition, Travers could not recall what source material was used to create the ringtones. (See Travers Dep. 19-23.) In a later declaration, however, he states that "[n]one of the MP3 files that I created [for the ringtones] were made from the Subject Masters that were delivered to Ryko in 1610 or 1630 format. (Declaration of Joe Travers dated Apr. 9, 2010, ¶ 17.) In contrast, Ryko's musicologist, Dr. Lawrence Ferrara, concludes that "performances in 10 Subject Master Ringtones are the same as the performances in the correlative portions in 10 Ryko[-]owned sound recordings." (Ex. JJ: Supplemental Expert Report of Dr. Lawrence Ferrara, at 1.)

V. Lather Sound Recordings

Among Zappa's many unreleased works are seven sound recordings referred to as the Lather Sound Recordings ("Lather"), the rights to which were not transferred to Ryko as Subject Masters under the 1994 Agreement. (Answer ¶ 25, Mar. 20, 2009, ECF No. 42.) Beginning in July 1996, ZFT entered into negotiations to transfer certain rights in Lather from to Ryko. (ZFT Statement of Material Facts pursuant to Local Rule 56.1 ("ZFT 56.1 Stmt.") ¶ 9; Ryko's Counterstatement of Material Facts pursuant to Local Rule 56.1 ("Ryko 56.1 Counterstmt.") ¶ 9.) Ryko's counsel sent ZFT's counsel a draft agreement relating to the transfer. (ZFT 56.1 Stmt. ¶ 10; Ryko 56.1 Counterstmt. ¶ 10.) About a month later ZFT's counsel requested changes to the proposed agreement, (ZFT 56.1 Stmt. ¶ 11; Ryko 56.1 Counterstmt. ¶ 11), stating that, "until [an] advance is paid . . . your client . . . has no rights to release the LP." (Declaration of Owen Sloane dated Mar. 19, 2010 ("Sloane Decl.") Ex. 2: Letter from Owen Sloane to Nick Gordon dated Aug. 30, 1996.) Ryko's counsel sent a revised

agreement with a cover letter stating he "hope[d]" it was satisfactory, but also reserving Ryko's rights to comment on the draft, together with a check for $100,000,[3] which was labeled as an "[a]dvance pursuant to ¶ 3 of the proposed Lather agreement." (Sloane Decl. Ex. 3: Letter from Nick Gordon to Owen Sloane dated Sept. 13, 1996; Sloane Decl. Ex. 4: Check from Ryko to ZFT dated Sept. 13, 1996.) ZFT's counsel acknowledged receipt of the check and responded that he "will have [his] comments to [Ryko] on the draft agreement shortly." (Sloane Decl. Ex. 5: Letter from Owen Sloane to Nick Gordon dated Sept. 20, 1996.) On September 25, 2006, ZFT's counsel sent a revised draft agreement to Ryko. (Sloane Decl. Ex. 6: Letter from Owen Sloane to Nick Gordon dated Sept. 25, 1996.) There were no further negotiations. (ZFT 56.1 Stmt. ¶ 16; Ryko 56.1 Counterstmt. ¶ 16.) Although the parties dispute whether an agreement was ever reached (see ZFT 56.1 Stmt. ¶ 16; Ryko 56.1 Stmt. ¶ 16), it is undisputed that no written agreement was ever executed (See ZFT 56.1 Stmt. ¶ 16; Ryko 56.1 Stmt. ¶ 16; Declaration of Matthew Savare dated Apr. 9, 2010, Ex. A: Deposition of Nicholas Gordon dated Sept. 30, 2009, at 180). Nevertheless, Ryko distributed an album titled "Lather," which included the Lather Sound Recordings. (ZFT 56.1 Stmt. ¶ 20; Ryko 56.1 Stmt. ¶ 20.)

Despite the absence of an executed agreement, ZFT delivered the Lather master sound recordings to Ryko prior to the Lather release. (Gail Zappa Dep. 180.) Gail Zappa also wrote and edited certain portions of the liner notes and conceptualized the album cover. (Gail Zappa Dep. 173-74.)

---

[3] The record is ambiguous as to whether this check was ever cashed.

DISCUSSION

I. Legal Standard

A party seeking summary judgment must demonstrate the absence of a "genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248. If the moving party meets its burden to "show that no genuine factual dispute exists," Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004), "the non[-]moving party must come forward with specific facts showing that there is a genuine [dispute] for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The Court resolves all factual ambiguities and draws all inferences in the non-moving party's favor. Liberty Lobby, 477 U.S. at 255. "Nonetheless, summary judgment is appropriate where . . . undisputed facts reveal that the plaintiff cannot establish an essential element of the claim, on which element the plaintiff has the burden of proof, and the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on that element." In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 509 (2d Cir. 2010).

II. Rykodisc's Motion for Partial Summary Judgment

    A. The "Strictly Commercial" Claims

As part of its Second Claim, ZFT alleges that Ryko breached the 1994 Agreement

by "[r]eleasing several Vault Masters, including 'Joe's Garage,' 'Don't Eat the Yellow Snow,' 'Montana,' and a 'disco' or 'dance' version of 'Dancin' Fool,' to which it had no rights." (Compl. ¶ 16(d).) ZFT's Seventh Claim asserts copyright infringement based on these same releases. (Compl. ¶ 79.) These Vault Masters were sold only on various releases of Strictly Commercial. Ryko asserts that these claims are barred by the 1999 Settlement. Gail Zappa admits that prior to 1999 she was aware of Ryko's distribution of "Joe's Garage," "Yellow Snow," and "Montana" on promotional releases of Strictly Commercial: The Best of Frank Zappa. (Declaration of Adelaide Gail Zappa dated April 9, 2010 ("Zappa Decl.") ¶ 48). However, other evidence in the record—the letter from Ryko to Gail Zappa regarding the marketing of Strictly Commercial as a "great gift idea" and the appearance of the album on pre-1999 royalty statements—clearly indicates that she was aware not just of promotional distribution, but also of sales. Accordingly, Gail Zappa's Second and Seventh Claims are barred insofar as they relate to sales of "Joe's Garage," "Yellow Snow," and "Montana" on CD releases of Strictly Commercial.

"Dancin' Fool" was sold only on an alternate release of Strictly Commercial in Japan. ZFT has offered no evidence that any infringing act occurred in the United States with respect to this release. Because United States copyright laws have no extraterritorial operation, Robert Stigwood Grp. Ltd v. O'Reilly, 530 F.2d 1096, 1101 (2d Cir. 1976), summary judgment is granted for Ryko insofar as ZFT's Second Claim relates to "Dancin' Fool."

B. The Restricted Cuts

ZFT's Fifth and Sixth Claims allege that Ryko "unlawfully, and without authority from [ZFT], digitally distributed, as singles, the Restricted Cuts," thereby infringing on ZFT's

-10-

rights to the sound recordings and compositions, respectively. (Compl. ¶¶ 50, 64.)

"To succeed on a claim for direct infringement under the Copyright Act, a plaintiff must show (1) ownership of a valid copyright, and (2) unauthorized copying or a violation of one of the other exclusive rights afforded copyright owners pursuant to the Copyright Act. Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 144 (citing Twin Peaks Prods. v. Publ'ns Int'l. Ltd., 996 F.2d 1366, 1372 (2d Cir. 1993)). Direct liability requires "volitional conduct" that "causes" the distribution to be made. See Cartoon Network LP v. CSC Holdings, Inc., 536 F.3d 121, 131 (2d Cir. 2008). Contributory liability for copyright infringement is premised on "personal conduct that encourages or assists the infringement." Arista Records, LLC v. Doe 3, 604 F.3d 110, 118 (2d Cir. 2010). This requires a showing that the conduct "intentionally induc[ed] or encourage[ed] direct infringement." Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005); see also Faulkner v. Nat'l Geo. Enters., 409 F.3d 26, 40 (2d Cir. 2005) ("One who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another, may be held liable.").

Here, there is no evidence establishing direct liability, since ZFT cannot point to volitional conduct by Ryko that caused the distribution. Rather, Apple, not Ryko, distributed these tracks. Nor has Zappa established a genuine dispute as to whether Ryko induced or encouraged Apple—or any other company, for that matter—to distribute the Restricted Cuts as singles. To the contrary, the evidence shows that Ryko took pains to ensure that Apple was aware of the track restrictions on the Restricted Cuts. Such conduct is incompatible with contributory infringement. Accordingly, summary judgment is granted in favor of Ryko on

ZFT's Fifth and Sixth Claims as they relate to the digital distribution of the individual Restricted Cuts.

First time, ZFT argues in its opposition papers that Ryko allowed the Restricted Cuts to be streamed in 30-second samples over iTunes, in violation of the 1994 agreement and ZFT's rights in these songs. However, an opposition to summary judgment is not the proper vehicle to raise additional claims. McAllister v. N.Y. City Police Dep't, 49 F. Supp. 2d 688, 697 (S.D.N.Y. 1999); see also Greenidge v. Allstate Ins. Co., 446 F.3d 356, 361 (declining to consider claim raised for the first time in opposition brief); Syracuse Broadcasting Corp. v. Newhouse, 236 F.2d 522, 525 (2d Cir. 1956) (The judge was "justified" in "brush[ing] aside a further charge, made in the briefs and affidavits, but not alleged in the complaint or subsequent statement of claims, nor in any way substantiated"). Accordingly, summary judgment is also granted for Ryko on ZFT's Fifth and Sixth Claims insofar as they relate to the streaming of 30-second clips over iTunes.

C. Media Format Dispute

ZFT's First Claim seeks a declaration that "Ryko does not have the right pursuant to the 1994 Agreement to digitally distribute the Subject Masters either directly or through sites such as Emusic, Napster, iTunes or other similar online sites." ZFT's Second Claim alleges a breach of the 1994 Agreement based on this digital distribution.

The interpretation of a contract is a matter of law for a court to decide. Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002). "The key inquiry at this initial interpretation stage is whether the contract is unambiguous with respect to the question disputed by the parties." Int'l Multifoods, 309 F.3d at 83. "If the court finds that

the contract is not ambiguous[,] it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence." Int'l Multifoods, 309 F.3d at 83. "If an ambiguity is found, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." Int'l Multifoods, 309 F.3d at 83 (quotations omitted). Here, the agreement unambiguously grants Ryko the right to distribute the Subject masters in "<u>any and all media</u> existing or hereafter discovered, developed or devised." (1994 Agreement ¶ 1.1.) In response to this seemingly clear directive, ZFT relies on ¶ 12.11, which prohibits Ryko from making any "changes in technical standards . . . which would impact on the integrity of the work as embodied in [the] 1610 or 1630 final version." (1994 Agreement ¶ 12.11.) Unfortunately, the term "technical standard" is undefined. According to ZFT, MP3 files have significantly reduced sound quality compared to 1610/1630 formats, and therefore impact the integrity of the work. (See, e.g., Travers Decl. ¶ 11; Zappa Decl. ¶¶ 74-75.) Releasing music with inferior sound quality is plausibly viewed as a change to a technical standard. Accordingly, the 1994 Agreement is ambiguous on this point. The extrinsic evidence to interpret this provision is inconclusive, and therefore summary judgment is denied insofar as ZFT's First and Second Claims relate to the right to distribute the Subject Masters in digital format.

However, there is no evidence in the record that the sound quality of vinyl in general impacts the integrity of a sound recording. The best that ZFT can offer on this point is the declaration of a sound engineer who states that "using an original analog mix to make a vinyl release . . . is far superior to using a 1610 or 1630 that was mastered for CD," and that "[u]sing a 1610 or 1630 that was mastered for CD to create a vinyl release will likely impact the

artistic integrity of the sound recording." (Declaration of Frank Filipetti dated Apr. 8, 2010, ¶ 10.) In other words, ZFT has only offered evidence that <u>depending on the process</u> by which vinyl releases are created, the integrity of the sound recording <u>might</u> be impacted. Moreover, the 1994 Agreement contains no express exclusion of vinyl, a particularly notable and significant omission given that vinyl was the predominant music distribution format when Zappa first began releasing music in the 1960s and was a well-known format at the time the Agreement was signed in 1994. If the parties had contemplated excluding vinyl from the 1994 Agreement, they could have done so expressly, rather than relying on vague references to "technical standards" and "integrity." Accordingly, summary judgment is granted in favor of Ryko on Plaintiffs' First and Second Claims insofar as they relate to the right to distribute the Subject Masters in vinyl format.

D. <u>Original Un-mixed Source Recordings and Unreleased Remixes</u>

In its Tenth Counterclaim, Ryko asserts that in granting copyrights to "all sound recordings . . . which heretofore have been commercially released," the 1994 Agreement granted them copyrights not just to final album mixes, but also to all underlying source tracks used to create them. ZFT counters that this language conveys only the final album mix. The term "sound recordings" is not defined in the Agreement. Furthermore, the Copyright Act, which provides that "sound recordings" are "works that result from the fixation of a series of musical, spoken, or other sounds" does not dispel the ambiguity. The term can plausibly be read to indicate either final album mixes or the underlying source tracks, and the 1994 Agreement is therefore ambiguous on this point. The extrinsic evidence is also open to multiple interpretations. ZFT asserts that the parties struck out language from a draft agreement that

would have granted Ryko the copyright to "all versions" and "all elements" of the Subject Masters. On the other hand, Ryko paid $20 million for the rights it acquired, a sum that would be difficult to justify if the 1994 Agreement permitted Zappa to openly compete by re-mixing the original source tracks and releasing re-mixed versions of the same albums it had just sold. Accordingly, a reasonable juror could find for either party, and summary judgment is denied on this claim.

### E. MOFO, Lumpy Money, and Hot Rats Vinyl

Ryko's First and Second Counterclaims assert state and common law copyright infringement against ZFT based on ZFT's sales of MOFO, Lumpy Money, and Hot Rats Vinyl, on the grounds that these releases were Subject Masters owned by Ryko (i.e., that they have been previously commercially released).

The record is conclusive that both MOFO and Hot Rats Vinyl were based on previously commercially released sound recordings. Disc 1 of MOFO contained the "Original Vinyl Stereo Mix" of Freak Out, which was created from the "same tape that was used to create the original vinyl release of Freak Out." (Ex. DD; Travers Dep. 216.) Similarly, Hot Rats Vinyl was created from the "original 1969 master tape used for the first pressings [of Hot Rats] in 1969." (Travers Dep. 16.) Disc 2 of Lumpy Money, which contains the "1984 UMRK Remix, originally released on CD [in] 1986," and which was released by Ryko prior to 1994, was also plainly based on sound recordings that had been previously commercially released. (Ex. GG; Travers Dep. 66.)

However, material issues of fact preclude a similar determination as to Disc 1 of Lumpy Money. Although the liner notes state that it is the "1968 Original Mono Mix," Travers

testified that although it was based on the same performances as the Ryko release, it is a "different mix." (Ex. GG; Travers Dep. 64.) Given this Court's holding that the 1994 Agreement is ambiguous as to whether it conveyed rights to underlying source tracks in addition to final mixes, summary judgment is denied as to Disc 1 of Lumpy Money.

ZFT's responds by citing to the "Tangible Materials" section of the 1994 Agreement, which states that ZFT will "deliver to Ryko . . . the best copies available of all tangible assets, physical materials and/or embodiment of the Subject Masters . . . [in] 1610s or 1630s of the final version of each Subject Master or the equivalent thereof." (1994 Agreement ¶ 8.4.) As the section heading demonstrates, however, ¶ 8.4 relates only to the delivery of tangible assets, not the sale of intangible intellectual property rights. It in no way modifies or clarifies Article 1, which relates to the "Purchase and Sale and Transfer of Master Recordings and Licenses of Other Assets." (1994 Agreement art. 1.)

The 1994 Agreement contains a no-oral-modification clause. Nevertheless, ZFT argues that Ryko stated consistently that under the 1994 Agreement it owned only those recordings physically delivered to ZFT in 1610 and 1630 format, and that these communications constituted an oral modification to that agreement. New York General Obligations Law § 15-301 provides that "a written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent." An exception to this prohibition exists where the oral agreement to modify the contract has been partially performed. Rose v. Spa Realty Assocs., 42 N.Y.2d 338, 340 (1977). However, "an action does not amount to partial performance

sufficient to overcome the statute where that action confers no benefit on the party against whom enforcement is sought." Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 122 (2d Cir. 1998). ZFT cannot say that it partially performed on the alleged oral modification because no benefit accrued to Ryko from ZFT's release of these albums. See Merrill Lynch, 155 F.3d at 122. Rather, the release of competing albums that were substantially similar to those sold by Ryko undoubtedly worked to Ryko's detriment. Accordingly, summary judgment is granted in favor of Ryko on their First and Second Counterclaims, insofar as they relate to MOFO, Hot Rats Vinyl, and Disc 2 of Lumpy Money.

F. Ringtones

Ryko's Fifth, Sixth, and Eighth Counterclaims assert claims for copyright infringement based on ten different cell phone ringtones sold by ZFT. Ferrara's determination that the ringtones were created from Ryko-owned recordings is uncontradicted. In response, ZFT points to Travers's declaration, which states that the ringtones were not created from "Subject Masters that were delivered to Ryko in 1610 or 1630 format." (Travers Decl. ¶ 17.) This does not create an issue of material fact. Notably, Travers does not state that the ringtones were created from previously unreleased sound recordings. Instead, he states only that they were not created from "Subject Masters." But whether a sound recording constitutes a Subject Master can only be determined by interpreting the 1994 Agreement, a legal determination for this Court. And as previously discussed, whether a sound recording was delivered to Ryko as a "Tangible Asset" in 1610 or 1630 format has no bearing on whether that recording is a Subject Master. Accordingly, summary judgment is granted in favor of Ryko on their Fifth, Sixth, and Eighth Counterclaims, insofar as they relate to the ten ringtones specified in their expert report.


III. ZFT's Motion for Partial Summary Judgment

ZFT moves for summary judgment on its Third and Fourth claims, relating to Ryko's distribution of Lather.

In order to transfer any of the <u>exclusive</u> rights comprised in a copyright, the transfer must be (1) in writing, and (2) signed by the party transferring its copyright ownership. 17 U.S.C. §§ 101, 204(a). Ryko argues that the $100,000 check constituted a sufficient signed writing. Alternatively, they argue that they issued Lather pursuant to an implied non-exclusive license. Non-exclusive licenses may be granted orally or implied from conduct. <u>Graham v. James</u>, 144 F.3d 229, 235 (2d Cir. 1998). In order for an implied license to be found, the defendants must show that there was a "meeting of the minds as determined by contract law." <u>Pavlica v. Beher</u>, 397 F. Supp. 2d 519, 526 (S.D.N.Y. 2005). However, "courts have found implied licenses only in 'narrow' circumstances where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it." <u>SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.</u>, 211 F.3d 21 (2d Cir. 2000). Here, there is evidence to suggest that ZFT delivered these tracks to Ryko, and that Gail Zappa cooperated in the album's release by drafting liner notes and designing the album's cover art. This is sufficient to create an issue of material fact as to whether Ryko distributed Lather pursuant to an implied non-exclusive license. Accordingly, this Court need not reach the issue of whether the check constituted a "signed writing," and ZFT's motion for summary judgment on its Third and Fourth claims is denied.

## CONCLUSION

For the forgoing reasons, Defendant Rykodisc, Inc.'s motion for partial summary judgment is granted in part and denied in part. Summary judgment is granted in favor of Ryko on the following claims: ZFT's First and Second Claims insofar as they relate to Ryko's right to distribute the Subject Masters in vinyl format; ZFT's Second and Seventh Claims insofar as they relate to CD sales of Strictly Commercial; ZFT's Fifth and Sixth Claims insofar as they relate to the digital distribution of the Restricted Cuts as singles and 30-second streaming samples; Ryko's First and Second Counterclaims insofar as they relate to ZFT's sale of MOFO, Hot Rats Vinyl, and Disc 2 of Lumpy Money; and Ryko's Fifth, Sixth, and Eighth Counterclaims insofar as they relate to ZFT's sale of ringtones. Ryko's motion is denied in all other respects. ZFT's motion for partial summary judgment is denied. The Clerk of Court is directed to terminate the motions pending at ECF Nos. 55 and 60.

Dated: August 17, 2011
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*All Counsel of Record*